# 14-1848-cv(L)
## 14-1849-cv(XAP)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

BPP WEALTH, INC., DEBRA SCHATZKI,

*Plaintiffs-Counter-Defendants-Appellees-Cross Appellants,*

—against—

WEISER CAPITAL MANAGEMENT, LLC, HOITSZ MICHEL, AKA CARIJN,

*Defendants-Counter-Claimants-Third Party Plaintiffs-Appellants-Cross Appellees,*

WEISERMAZARS, LLP,

*Defendant-Counter-Claimant-Third Party Plaintiff,*

—against—

BRIAN S. EDELMAN, FINANCIAL COMPUTER SERVICES, INC., EBIX, INC.,

*Third-Party-Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## PAGE PROOF BRIEF FOR DEFENDANTS-COUNTER-CLAIMANTS-THIRD PARTY PLAINTIFFS-APPELLANTS-CROSS APPELLEES

SCOTT UNGER
STARK & STARK, PC
993 Lenox Drive, Building 2
Lawrenceville, New Jersey 08648
(609) 896-9060

*Attorneys for Defendants-Counter-Claimants-Third Party Plaintiffs-Appellants-Cross Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, defendant-appellant Weiser Capital Management, LLC (n/k/a WeiserMazars Wealth Advisors, LLC) certifies that it is a wholly-owned subsidiary of Weiser Holding Group, LLC, which in turn is a wholly-owned subsidiary of WeiserMazars LLP. WeiserMazars LLP is a partnership with no stock ownership or parent company, and no publicly-held corporation owns ten percent or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................i

TABLE OF AUTHORITIES ................................iv

STATEMENT OF JURISDICTION ...........................1

STATEMENT OF THE CASE ...............................2

ISSUES PRESENTED ....................................7

STATEMENT OF FACTS ..................................8

      A. The Overall Picture ........................8

      B. The Website Issue ..........................9

      C. The Database Issue ........................11

SUMMARY OF ARGUMENT ................................18

ARGUMENT ..........................................20

      POINT I.   THE TRIAL COURT ERRED IN AWARDING
                    PREJUDGMENT INTEREST ON THE
                    CONVERSION COUNT ...................20

      POINT II.  DEFENDANTS ARE ENTITLED TO
                    JUDGMENT AS A MATTER OF LAW ON
                    THE CONVERSION COUNT ..............25

      POINT III. DEFENDANTS ARE ENTITLED TO
                    JUDGMENT AS A MATTER OF LAW ON
                    THE TRADEMARK INFRINGEMENT COUNT ... 36

CONCLUSION ........................................44

CERTIFICATE OF COMPLIANCE ...........................45

ADDENDUM ...........................................47

## TABLE OF AUTHORITIES

Page

Cases

24/7 Records, Inc. v. Sony Music Entertainment,
    Inc., 566 F. Supp. 2d 305 (S.D.N.Y. 2008) ..30, 34

All Star Championship Racing, Inc. v.
    O'Reilly Automotive Stores, Inc.,
    940 F. Supp. 2d 850 (C.D. Ill. 2013) .........40

Arrow Fastener Co. v. Stanley Works,
    59 F.3d 384 (2d Cir. 1995) ...................37

Century 21 Real Estate, LLC v. Destiny
    Real Estate Properties, 2011 U.S. Dist.
    LEXIS 147075 (N.D. Ind. Dec. 19, 2011) .......39

Collier v. Granger, 258 F. Supp. 717
    (S.D.N.Y. 1966) ..............................21

Daubert v. Merrell Dow Pharmaceuticals,
    509 U.S. 579 (1993) ..........................26

Diesel v. Town of Lewisboro, 232 F.3d 92
    (2d Cir. 2000) ...............................26

DiSanto v. Forsyth, 258 A.D.2d 497,
    684 N.Y.S.2d 628 (1999) ......................28

Dura Pharmaceuticals, Inc. v. Broudo,
    544 U.S. 336 (2005) ..........................27

Gala Jewelry, Inc. v. Harring, 2007 U.S. Dist.
    LEXIS 19640 (S.D.N.Y. Mar. 1, 2007) ........23, 24

Gruner + Jahr USA Publishing v. Pfizer, Inc.,
    991 F.2d 1072 (2d Cir. 1993) .................37

Gucci Am., Inc. v. Duty Free Apparel, Ltd.,
        286 F. Supp. 2d 284 (S.D.N.Y. 2003) ........38, 41

Hamil Am., Inc. v. GFI, 193 F.3d 92
        (2d Cir. 1999) ................................27

Healing Power Inc. v. Ace Continental
        Exports, Ltd., 2008 U.S. Dist. LEXIS
        120204 (E.D.N.Y. Sept. 30, 2008) ..............30

Highland Capital Management, LP v. Schneider,
        607 F.3d 322 (2d Cir. 2010) ...................36

Hooks v. Forman, Holt, Eliades & Ravin, LLC,
        717 F.3d 282 (2d Cir. 2013) ...................36

Kassis v. Teachers' Ins. & Annuity Ass'n,
        13 A.D.3d 165, 786 N.Y.S.2d 473 (2004) ........20

Kenford Co. v. County of Erie, 67 N.Y.2d 257,
        493 N.E.2d 234, 502 N.Y.S.2d 131 (1986) .......26

Kumho Tire Co. v. Carmichael,
        526 U.S. 137 (1999) ...........................26

Lang v. Retirement Living Publishing Co.,
        949 F.2d 576 (2d Cir. 1991) ...................37

Levine v. American Fed. Group, 180 A.D.2d 575,
        580 N.Y.S.2d 287 (1992) .......................28

Men's World Outlet, Inc. v. Estate of Steinberg,
        101 A.D.2d 854, 476 N.Y.S.2d 171 (1984) .......21

Microstrategy Inc. v. Bus. Objects, S.A.,
        429 F.3d 1344 (Fed. Cir. 2005) ................34

Millennium Expressions, Inc. v. Chauss
        Marketing, Ltd., 2007 WL 950070
        (S.D.N.Y. Mar. 30, 2007) ...................27, 28

Motor City Bagels, L.L.C. v. American Bagel Co.,
        50 F. Supp. 2d 460 (D. Md. 1999) ..............39

Murphy v. American Home Prods., 58 N.Y.2d 293,
        448 N.E.2d 86, 461 N.Y.S.2d 232 (1983) .......32

Nimely v. City of New York, 414 F.3d 381
        (2d Cir. 2005) ................................25

Palermo v. Taccone, 79 A.D.3d 1616,
        913 N.Y.S.2d 859 (2010) ......................30

Pennzoil-Quaker State Co. v. Smith,
        2008 U.S. Dist. LEXIS 124298
        (W.D. Pa. Mar. 7, 2008) ......................39

Popovich v. Sony Music Entertainment, Inc.,
        508 F.3d 348 (6th Cir. 2007) .................20

S.A.B. Enterprises, Inc. v. Village of Athens,
        164 A.D.2d 558, 564 N.Y.S.2d 817 (1991) .......30

Schonfeld v. Hilliard, 218 F.3d 164
        (2d Cir. 2000) ............................26, 30

Stagl v. Delta Air Lines, 117 F.3d 76
        (2d Cir. 1997) ................................26

State of Idaho Potato Comm'n v. G&T Terminal
        Packaging, Inc., 425 F.3d 708
        (9th Cir. 2005) ..............................39

Streetwise Maps, Inc. v. VanDam, Inc.,
        159 F.3d 739 (2d Cir. 1998) ..................37

Toltec Fabrics, Inc. v. August Inc.,
        29 F.3d 778 (2d Cir. 1994) ................27, 29

Trademark Research Corp. v. Maxwell
        Online, Inc., 995 F.2d 326
        (2d Cir. 1993) ...........................*passim*

U.S. Structures, Inc. v. J.P. Structures, Inc.,
        130 F.3d 1185 (6th Cir. 1997) .............39, 41

Statutes

15 U.S.C. §§ 1051-1129 ...............................1

15 U.S.C. § 1116(d) ..............................38, 47

15 U.S.C. § 1117(c) ..............................38, 48

28 U.S.C. § 1291 ....................................1

28 U.S.C. § 1331 ....................................1

28 U.S.C. § 1367 ....................................1

Rules

Fed. R. Evid. 702 ..................................34

## STATEMENT OF JURISDICTION

This action was removed from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.  (Dkt. No. 1).  The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367, as the complaint included a claim for trademark infringement in violation of 15 U.S.C. §§ 1051-1129.

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291, as it is an appeal as of right from a final judgment of the district court that disposed of all claims.  Judgment was entered on March 14, 2014.  (Dkt. No. 269)  Defendants-appellants renewed their motion for judgment as a matter of law on March 20, 2014.  (Dkt. No. 271).  The district court denied that motion on May 12, 2014.  (Dkt. No. 277).  The notice of appeal was timely filed on May 21, 2014.  (Dkt. No. 278).

## STATEMENT OF THE CASE

Plaintiffs Debra Schatzki, a financial planner, and her company, BPP Capital Management, Inc., an insurance brokerage firm (sometimes collectively, "Schatzki"), brought an action in New York state court against defendants WeiserMazars LLP, an accounting firm; Weiser Capital Management, LLC ("Capital Management"), an investment advisory firm, WeiserMazars' wholly-owned subsidiary, and Schatzki's former employer; and Hoitsz Carijn Michel, Schatzki's former colleague who remained with Capital Management after Capital Management terminated Schatzki's employment. See June 16, 2010 Notice of Removal (Dkt. No. 1). Defendants removed the action based on federal question jurisdiction to the United States District Court for the Southern District of New York, where it was assigned to Hon. Robert W. Sweet. See id.

Although the third amended complaint, on which the parties went to trial, contained multiple counts, only two are pertinent to this appeal. The other

2

counts ended either in a summary disposition or in a defense verdict.

One was a Lanham Act claim for infringement of BPP's service mark "Building, Protecting and Preserving Wealth for Generations." See Third Am. Compl. (Dkt. No. 96, at ¶¶ 65-69). Schatzki requested that the mark be removed from Capital Management's website after Capital Management terminated her. See Jan. 22, 2014 Trial Tr., at 546:14-15. There was a divergence in the testimony about how long it took, but there was no evidence Capital Management did not do so prior to notice of the commencement of this action. See Jan. 17, 2014 Trial Tr., at 301:24-25; Jan. 22, 2014 Trial Tr., at 546:16 to 547:14.

The other was a common law conversion claim based on Schatzki's alleged inability for a period to access some of her client data through a software program resident "in the cloud." See Third Am. Compl. (Dkt. No. 96, at ¶¶ 70-77). Capital Management had provided Schatzki contact information for clients

3

believed to be of her origination to use during that time.  See Jan. 16, 2014 Trial Tr., at 107:6-22, 111:21, 203:9 to 204:14; Jan. 17, 2014 Trial Tr., at 259:16 to 260:15, 318:7-22; Jan. 22, 2014 Trial Tr., at 554:2 to 557:10.

Schatzki named an accountant as her damages expert on the conversion claim.  Judge Sweet denied without a hearing defendants' Daubert motion to exclude his testimony, though defendants requested one both before and during the trial.  See June 7, 2013 Defs.' Motion (Dkt. Nos. 153-155); Dec. 4, 2013 Op. (Dkt. No. 226, at p. 5); Jan. 2, 2014 Defs.' Motion (Dkt. Nos. 236-238); Jan. 13, 2014 Status Conf. Tr., at 7:7 to 11:17; Jan. 21, 2014 Trial Tr., at 366:11-15.  He held that the bases for exclusion of the expert's opinions that defendants advanced went to weight and not to admissibility.  Dec. 4, 2013 Opinion (Dkt. No. 226, at p. 5).

Defendants moved for judgment as a matter of law at the close of Schatzki's case.  See Jan. 23, 2014

4

Trial Tr., at 690:4 to 709:25.  Judge Sweet denied the
motion, as Schatzki had elected to pursue statutory
damages and Judge Sweet acted as trier of fact on the
trademark infringement claim.  Id. at 709:6-9.  He
denied the motion on the conversion claim on the ground
that there were triable issues with respect to
causation and damages.  Id. at 709:16-19.

The jury found for Schatzki on the conversion
count and awarded her $300,000 in damages.  See Jan.
24, 2014 Trial Tr., at 930:41 to 931:10; Mar. 14, 2014
Judgment (Dkt. No. 269).  Judge Sweet found for her on
the trademark infringement count and awarded her
$15,000.  Jan. 29, 2014 Opinion (Dkt. No. 247, at pp.
6-8); Mar. 14, 2014 Judgment (Dkt. No. 269).
Thereafter, over defendants' objection, (Dkt. Nos. 249,
251), Judge Sweet added prejudgment interest at the New
York statutory rate to the jury's award.  See Feb. 18,
2014 Opinion (Dkt. No. 267); Mar. 14, 2014 Judgment
(Dkt. No. 269).  Judgment was entered against Capital
Management and Michel on the conversion claim and

5

against Capital Management only on the infringement claim. Mar. 14, 2014 Judgment (Dkt. No. 269).

After the district court had denied defendants' renewed motion for judgment (see Mar. 20, 2014 Motion (Dkt. Nos. 271, 272), May 12, 2014 Mem. & Op. (Dkt. No. 277)), defendants appealed (Dkt. No. 278).

## ISSUES PRESENTED

1.  Did the district court err in awarding prejudgment interest when Schatzki's expert had included interest in his damages testimony?

2.  Did the district court err in permitting Schatzki's damages expert to testify to damages from the alleged conversion and in permitting the conversion claim to go to the jury when the expert, who provided the only evidence to support the damages, employed a faulty methodology and an incorrect measure of damages?

3.  Did the district court err in awarding statutory damages on the trademark infringement claim in the absence of evidence of a "counterfeit mark?"

4.  Did the district court err in finding for Schatzki on the trademark infringement claim in the absence of proof of actual or potential confusion?

## STATEMENT OF FACTS[1]

A.  <u>The Overall Picture</u>

In 2007 Capital Management hired Ms. Schatzki and certain of the people who had worked with her at another New York City area accounting firm as at-will employees in order to augment Capital Management's wealth advisory services.  Jan. 15, 2014 Trial Tr., at 73:23 to 74:16.  Schatzki successfully insisted that Capital Management use BPP's registered service mark, "Building, Protecting and Preserving Wealth for Generations."  Jan. 22, 2014 Trial Tr., at 546:1-3. Schatzki also successfully insisted that Capital Management use a third party's database software, into which software various employees of Capital Management, including both those who came with her and those were already there, placed their client and prospect information and to which information they all had access.  Jan. 16, 2014 Trial Tr., at 145:19-24, 147:18

_____

[1] Where there is a conflict in the evidence, these facts are recited in a light most favorable to Schatzki as the prevailing party on these claims.

to 149:2, 149:18 to 151:12, 167:25 to 168:2; Jan. 22, 2014 Trial Tr., at 540:3 to 541:22.

Capital Management did poorly under Schatzki's aegis. Jan. 16, 2014 Trial Tr., at 144:19 to 145:5; Jan. 22, 2014 Trial Tr., at 543:6-8. Accordingly, in May, 2010, about three years after her hiring, Capital Management terminated her employment. Jan. 16, 2014 Trial Tr., at 199:22 to 200:2. It did not terminate the employment of any of the others who had come with her, however, and they did not choose to go with her. Jan. 16, 204 Trial Tr., at 179:22 to 180:3; Jan. 22, 2014 Trial Tr., at 624:20 to 625:12, 645:13-17, 665:14 to 666:14; Jan. 23, 2014 Trial Tr., at 740:11 to 741:4

### B.   The Website Issue

The evidence that placed Schatzki's registered service mark on the Capital Management website for the longest period of time was that of her brother, who said that it was still there on June 8, 2010, less than a month after Schatzki's discharge. Jan. 17, 2014 Trial Tr., at 301:24-25; compare Jan. 22, 2014 Trial

9

Tr., at 546:16 to 547:14 (testimony of Michel that service mark was removed from website "a couple of days" after May 19, 2014). Schatzki testified that the mark merely described what she (and, parenthetically, Capital Management) did -- to build, protect, and preserve wealth over multiple generations. Jan. 16, 2014 Trial Tr., at 208:3-10.

There was no evidence of any actual or even potential confusion as a result of the mark's remaining on the Capital Management website for that two-week to one-month period. No customer or prospective customer testified; Schatzki introduced no exhibit that evinced such confusion; and she put in no survey evidence that supported such confusion. She also introduced no evidence that she had lost any actual or prospective customer as a result of the slogan's appearing on the website. But see Jan. 22, 2014 Trial Tr., at 546:4-13 (testimony of Michel that Capital Management did not receive any clients as a result of the use of the service mark).

10

C.  The Database Issue

Believing that applicable law and regulations, and particularly Regulation S-P, 17 CFR pt. 248, required it do so, Capital Management changed the database login credentials in order to protect client data belonging to Capital Management (and not belonging to Schatzki), and prevent unauthorized access and disclosure of Capital Management clients' confidential information, which included data of numerous clients serviced by Capital Management as Registered Investment Advisor.  See Jan. 21, 2014 Trial Tr., at 373:11-17; Jan. 22, 2014 Trial Tr., at 553:21 to 554:1; see also Jan. 16, 2014 Trial Tr., at 158:4 to 163:21, 166:5 to 167:17.  The effect was to restrict Schatzki's access to the database until those customers could give direction about whether they wished to stay with Capital Management, go with Schatzki, or make other arrangements.  Id. at 562:5-12.  In order to attempt to mitigate any potential prejudice to Schatzki, however, Capital Management promptly made available to her

11

certain information about the clients who could be identified as hers and gave her access to her Contacts list in Microsoft Outlook, to her Capital Management office computer, and to at least some of her paper files. Jan. 16, 2014 Trial Tr., at 107:6-22, 111:21, 203:9 to 204:14; Jan. 17, 2014 Trial Tr., at 259:16 to 260:15, 318:7-22; Jan. 22, 2014 Trial Tr., at 554:2 to 557:10.   In addition, she always had access to information regarding her broker-dealer clients, none of which she lost.   Jan. 16, 2014 Trial Tr., at 109:1-8, 109:14-19, 111:19-20.

Approximately two weeks later, the third-party vendor gave Schatzki access to at least her client contact information, and cut off Capital Management from, the database.[2]  Jan. 16, 2014 Trial Tr., at 112:9 to 113:14, 176:14-20; Jan. 17, 2014 Trial Tr., at 262:2-5, 302:9 to 303:25.   Although a copy of the

---

[2] The vendor later cut off both Schatzki and Capital Management for about a month due to the litigation's pendency.   Jan. 16, 2014 Trial Tr., at 113:15-24, 176:14-20; Jan. 17, 2014 Trial Tr., at 302:9 to 303:25. There was nothing to suggest that Capital Management was responsible for the vendor's doing so.

database inadvertently remained in the backup for Capital Management's computer system, there was no evidence that Capital Management ever used that information.[3]

Schatzki did not identify any customer that she had lost as a result of her inability to contact that customer during the period that she lacked access to the database. No customer or prospective customer testified to that effect. Instead, Schatzki's quantification of damages rested entirely on the testimony of Richard Childs, an accounting expert whom she had retained. Childs did not identify any such customer either; nor did he employ the usual measure of damages in conversion cases, the value of the misappropriated property.

Instead, Childs purported to quantify "lost profit" damages using a "before and after" method.

---

[3] Consistent with this observation, Judge Sweet found for defendants on Schatzki's unjust enrichment claim pertaining to Capital Management's access to it. See Jan. 29, 2014 Opinion (Dkt. No. 247, at pp. 3-6); Mar. 14, 2014 Judgment (Dkt. No. 269).

Jan. 21, 2014 Trial Tr., at 396:25 to 398:15.   He looked at Schatzki's gross receipts for whole years before the alleged brief conversion of (denial of access to) the database and compared those revenues to her revenues in the years that followed.   <u>See</u> Aug. 14, 2012 Childs Dep., at 108:14-18, relevant portions of which are attached as Ex. "A" to Defs.' Daubert Motion (Dkt. No. 146-3, at p. 16); Jan. 21, 2014 Trial Tr., at 398:21-25, 415:6-23, 418:17-21.   Childs' methodology did not take into account any change in expenses between the "before" and the "after."   <u>See</u> Aug. 14, 2012 Childs Dep., at 67:16-19, 72:9-16, 76:3 to 77:11, 98:25 to 100:16 (Dkt. No. 146-3, at pp. 9-11, 15); Jan. 21, 2014 Trial Tr., at 433:2 to 434:10, 452:17 to 456:16.

Childs included in "gross receipts" the money that Schatzki received other than from customers.   <u>See</u> Aug. 14, 2012 Childs Dep. at 85:23 to 86:10, 94:23 to 95:20, 108:10-23 (Dkt. No. 146-3, at pp. 13-14, 16); Jan. 21, 2014 Trial Tr., at 418:22 to 430:8, 450:19 to

14

451:4.  Thus, within "gross receipts" in the "before" period, but obviously not in the "after," were hundreds of thousands of dollars in salary and other benefits that Capital Management was paying Schatzki before her termination.  See id.; see also Aug. 14, 2012 Childs Dep. at 84:20 to 92:20, 174:16 to 175:15 (Dkt. No. 236-2, at pp. 3-5, 10); Jan. 21, 2014 Trial Tr., at 405:21-25; 431:22 to 434:25.

In addition, Childs included within "gross receipts" the money flowing to Schatzki that would not be deemed revenues in the accounting sense.  Thus, Childs included as "gross receipts" in the "before" period money that Capital Management had reimbursed Schatzki for out-of-pocket business expenses.  See Aug. 14, 2012 Childs Dep., at 67:16-19, 72:9-16, 76:3 to 77:11, 98:25 to 100:16 (Dkt. No. 146-3, at pp. 9-11, 15); Jan. 21, 2014 Trial Tr., at 433:2 to 434:10, 452:17 to 456:16.  After her termination, Schatzki received no such reimbursements of course.  See id.

Childs did not identify the cause of the decline in Schatzki's gross receipts. Instead, he assumed that the entirety of the decline constituted Schatzki's damages. See Aug. 14, 2012 Childs Dep., at 92:21 to 100:23 (Dkt. No. 146-3, at pp. 14-15); Jan. 21, 2014 Trial Tr., at 414:17 to 418:21, 424:2-7, 427:2-24. Childs therefore did nothing to exclude causes for it other than the short-term denial of access to the database. Thus, he did not account for the fact that Schatzki was no longer part of a large, well-established accounting firm, but rather had been terminated from it, even though the complaint did not contain a wrongful termination claim. Aug. 14, 2012 Childs Dep. at 84:20 to 92:20, 94:23 to 95:20, 174:16 to 175:15 (Dkt. Nos. 146-3, at pp. 13-14, 236-2, at pp. 3-5, 10); Jan. 21, 2014 Trial Tr., at 405:21-25, 424:17 to 425:12. Childs did not account for the fact that all of the remaining people who had come with her to Capital Management (and who Schatzki acknowledged had their own relations with the customers) not only stayed

16

at Capital Management after her termination, but competed with her for their business after she had departed. Aug. 14, 2012 Childs Dep., at 35:11 to 37:10, 40:13-20, 44:25 to 45:10, 112:15-25 (Dkt. No. 146-3, at pp. 3-6, 17); Jan. 21, 2014 Trial Tr., at 412:25 to 414:16   He did not account for general economic trends or industry-specific trends. Aug. 14, 2012 Childs Dep., at 38:2-6, 113:1-24 (Dkt. No. 146-3, at pp. 4, 18); Jan. 21, 2014 Trial Tr., at 418:13-16.

## SUMMARY OF ARGUMENT

The court below erred in awarding prejudgment interest on a verdict for conversion.  Though that cause of action entitles the prevailing party to interest under New York law, where the plaintiff's expert witness included interest in the damages to which he testified, controlling precedent from this Court, in order to prevent the possibility of a double recovery of interest, renders the court's interest award error.

Defendants are entitled to judgment on the conversion count in any event.  The record does not provide a reasonable basis for the award of damages, it includes no evidence of causation, and there was no control for other factors that could have produced the changes in financial results that entirely underlay Schatzki's prima facie showing.  In addition, the expert testimony that was the evidentiary support for the damages claimed used a method –– gross receipts instead of net profits – that is impermissible under

18

New York law, and it included within those receipts a number of items that under any reasonable view should have been excluded. The district court should have excluded the expert's testimony and, irrespective of whether it did, entered judgment for defendants on this count.

Defendants are also entitled to judgment on the trademark infringement count. Schatzki sought and was awarded only statutory damages, which award depended on the existence of a counterfeit mark. If that term be properly interpreted, there was none here. There also was no proof of confusion, which may not be presumed on the facts of this case.

**ARGUMENT**

**POINT I**

**THE TRIAL COURT ERRED IN AWARDING PREJUDGMENT INTEREST ON THE CONVERSION COUNT.**

The trial court erred in awarding prejudgment interest on the conversion count. This error was significant, as it amounted to about a quarter of the entire judgment for Schatzki. See Judgment (Dkt. No. 269). It is a question of law subject to de novo review. See Popovich v. Sony Music Entertainment, Inc., 508 F.3d 348, 361-62 (6th Cir. 2007) (applying New York law).

The law does not permit a double interest award. Rather, this Court has held that when "there is a possibility that the jury award already allowed interest," a court errs in tacking on prejudgment interest. Trademark Research Corp. v. Maxwell Online, Inc., 995 F.2d 326, 342 (2d Cir. 1993); see Kassis v. Teachers' Ins. & Annuity Ass'n, 13 A.D.3d 165, 165-66, 786 N.Y.S.2d 473, 473 (2004) (no entitlement to prejudgment interest when plaintiff's trial proof took

into account the time value of money, which has same purpose as interest award); Men's World Outlet, Inc. v. Estate of Steinberg, 101 A.D.2d 854, 476 N.Y.S.2d 171 (1984). As Schatzki's expert had expressly included prejudgment interest in the damages to which he testified (see Jan. 21, 2014 Trial Tr., at 401; see also Childs' Revised Report of July 23, 2012, attached as Ex. "A" to Pls.' Opp. to Defs.' Daubert Motion (Dkt. No. 186-1, at p. 11), and Judge Sweet had not instructed the jury to disregard that component in making its damages award, it was error for Judge Sweet to add over $100,000 in prejudgment interest to the verdict.

As this Court held in Trademark Research, the test is possibility: "New York law . . . precludes an award of prejudgment interest if the possibility exists that the jury's award includes any prejudgment interest." 995 F.2d at 342. The test is about as black line as it gets. See also Collier v. Granger, 258 F. Supp. 717, 720 (S.D.N.Y. 1966) (interest award

only proper where jury "obviously" did not consider interest).

Proof of what the jury actually did -- given the sanctity of jury deliberations, obviously something that one opposing an interest award could never establish -- is not required. As this Court held, it suffices that the jury might have included any amount of interest in its award. Trademark Research, 995 F.2d at 342.

Judge Sweet justified his award of prejudgment interest largely by reference to the mandatory nature of prejudgment interest in cases of this type under NY CPLR 5001. See Feb. 18, 2014 Opinion (Dkt. No. 267, at pp. 4-5). But such was the situation as well in Trademark Research, which applied New York law. As that case made clear, its rationale was to prevent a potential double recovery of interest, not to preclude the recovery of interest entirely. If Schatzki had wanted to ensure the recovery of interest on any judgment at the statutory rate in the face of Trademark

22

Research, her counsel could simply have not had Childs include it in his damages calculation or testify about it.

Judge Sweet not surprisingly therefore went on to try to distinguish Trademark Research. See Feb. 18, 2014 Opinion (Dkt. No. 267, at pp. 4-5). His distinction was limited to a single sentence: "The situation here is different from that contemplated in Trademark Research . . ., where the damages plaintiff sought from the jury included a computation of interest." Id. But Judge Sweet's distinction did not explain why the fact of a computation made this case different in any legally meaningful way from that in this Court's decision. Schatzki's expert still put forward an interest figure onto which the jury might have latched; and that fact brought this case within the "possibility" rule and the anti-double recovery rationale of Trademark Research.[4]

_____

[4] Gala Jewelry, Inc. v. Harring, 2007 U.S. Dist. LEXIS 19640 (S.D.N.Y. Mar. 1, 2007), does not suggest a contrary conclusion here. As Judge Lynch noted, there

Accordingly, this Court should vacate the prejudgment interest award in any event.

---

was nothing there before the jury that would have suggested that it might award interest, and the amount that the jury did award was "consistent with the value of the missing" property. <u>Id.</u> at *4.

**POINT II**

**DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE CONVERSION COUNT.**

Resolution of the interest issue should not be necessary, however, as defendants are entitled to judgment as a matter of law on the conversion count, which underlies the prejudgment interest award. The district judge should not have allowed Childs, who provided the only evidentiary support for the jury's damages award, to testify to damages using the methodology that he did. Without his testimony there was no factual predicate for the damages award. Alternatively, even accepting as a predicate the admission of his testimony, it does not provide a legally sufficient basis for awarding damages on this count.

Admissibility as against a Daubert and Kumho Tire challenge is normally tested on appeal against an abuse of discretion standard. See, e.g., Nimely v. City of New York, 414 F.3d 381, 393 (2d Cir. 2005). However, legal errors in connection with an expert's

25

testimony, see, e.g., Schonfeld v. Hilliard, 218 F.3d 164 (2d Cir. 2000), and issues regarding the sufficiency of evidence to survive a motion for judgment, e.g., Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000), are reviewed de novo.

The Court is no doubt fully aware of the Supreme Court's directive that trial judges act as "gatekeepers" of proffered expert testimony. Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993); see Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999). Among the matters tested are the methodology that the expert employs and the application of that methodology to the facts of the case. E.g., Stagl v. Delta Air Lines, 117 F.3d 76, 81 (2d Cir. 1997).

Schatzki's damages proof on this count fails under scrutiny for three reasons.

First, Childs made no effort to tie the change in Schatzki's revenues to the conversion, as New York law requires. E.g., Kenford Co. v. County of Erie, 67 N.Y.2d 257, 261, 493 N.E.2d 234, 235, 502 N.Y.S.2d 131,

132 (1986) ("directly traceable to the [wrongful conduct], not . . . the result of other intervening causes"); accord, Toltec Fabrics, Inc. v. August Inc., 29 F.3d 778 (2d Cir. 1994); cf. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 342-43 (2005) ("When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events"). Thus, "[w]hen seeking an award of damages for lost sales, the burden is on the plaintiff to demonstrate that it would have made the sales but for the infringing activity." Hamil Am., Inc. v. GFI, 193 F.3d 92, 108 (2d Cir. 1999). "An award cannot stand if based on 'little more than guesswork.'" Toltec Fabrics, 29 F.3d at 781 (citations omitted). For this reason, courts applying New York law have generally rejected claims of lost future sales to unidentified customers. See, e.g., Millennium

27

Expressions, Inc. v. Chauss Marketing, Ltd., 2007 WL 950070, at *12 (S.D.N.Y. Mar. 30, 2007); DiSanto v. Forsyth, 258 A.D.2d 497, 684 N.Y.S.2d 628 (1999).

This is not the kind of case, such as a car accident where the plaintiff is physically fine before the accident but suffering from severe symptoms after it, where a "before and after" approach works purely as a matter of logical inference. See Levine v. American Fed. Group, 180 A.D.2d 575, 577, 580 N.Y.S.2d 287, 288 (1992) (one who seeks lost profits must prove that they were "the natural consequence[] of the . . . commission of a tortious act"). It would require a leap of logic to infer solely from a denial of access for a limited period to some client information (pertaining to clients she had served for years if not generations) the conclusion that Schatzki's revenues had been substantially diminished for subsequent years as a result. Indeed, Childs himself testified that the loss of any customers might have been attributable to

28

Capital Management's termination of Schatzki.  Jan. 21, 2014 Trial Tr., at 402:15-21.

Such a logical leap is impermissible.  See Toltec Fabrics, 29 F.3d at 784 (upholding judgment as a matter of law for defendant despite fact that four customers identified who did not place new orders; absent proof of customers' reasons for doing so, "a jury could not with reasonable certainty attribute the lack of recent orders" to event in question).  Indeed, Childs conceded that he had not considered the quick restoration of access to Schatzki and that, if he had considered it, it would have caused him to reach different results.  Aug. 14, 2012 Childs Dep., at 59:12 to 60:24, 152:6-20 (Dkt. No. 146-3, at pp. 8, 19); Jan. 21, 2014 Trial Tr., at 409:20 to 411:7.

Childs might have been on firmer ground in assuming causation of damages from the short-term denial of access to the database had there been other proof of causation in the record; but this evidentiary lacuna remained unfilled.  The only other support on

29

the causation issue was Schatzki's own generalized and factually unsupported belief that the denial of access was the cause of her woes. See Jan. 16, 2014 Trial Tr., 116:10 to 117:6.

Second, Childs quantified damages based on a change in revenues without doing anything to account for changes in expenses. While New York permits damages in the form of lost profits that can be proven to have flowed from the conversion with reasonable certainty, e.g., Schonfeld, 218 F.3d at 172; Palermo v. Taccone, 79 A.D.3d 1616, 1618-19, 913 N.Y.S.2d 859, 862 (2010), the legal standard is "lost profits," not "lost revenues." E.g., S.A.B. Enterprises, Inc. v. Village of Athens, 164 A.D.2d 558, 565-66, 564 N.Y.S.2d 817, 822 (1991); 24/7 Records, Inc. v. Sony Music Entertainment, Inc., 566 F. Supp. 2d 305, 316 (S.D.N.Y. 2008); Healing Power Inc. v. Ace Continental Exports, Ltd., 2008 U.S. Dist. LEXIS 120204, at *17-*18 (E.D.N.Y. Sept. 30, 2008).

Childs did not testify to lost profits. Thus, he did nothing to account for Schatzki's having to assume the expenses that Capital Management had been paying for her, including but not limited to telecommunications costs, travel expenses, business gifts, software licensing fees, advertising, automobile expenses, dues and subscriptions, and insurance, all of which were included in the "before" component of Childs' analysis. See Aug. 14, 2012 Childs Dep., at 67:16-19, 72:9-16, 76:3 to 77:11, 98:25 to 100:16 (Dkt. No. 146-3, at pp. 9-11, 15); Jan. 21, 2014 Trial Tr., at 433:2 to 434:10, 452:17 to 456:16. Childs conceded here that his conclusions would have been different, perhaps very different, if he had done so. Aug. 14, 2012 Childs Dep., at 120:19-25 (Dkt. No. 146-3).

Third, Childs included in gross revenues amounts that could not remotely be factored into damages. Thus, he included Schatzki's salary from Capital Management for the "before" period. Aug. 14, 2012 Childs Dep. at 84:20 to 92:20, 94:23 to 95:20,

31

174:16 to 175:15 (Dkt. Nos. 146-3, at pp. 13-14, 236-2, at pp. 3-5, 10); Jan. 21, 2014 Trial Tr., at 405:21-25, 418:22 to 434:25, 450:19 to 451:4.  As that salary ended with her termination, there was a swing of hundreds of thousands of dollars that could not be attributed to any loss of customers from any cause. Moreover, permitting Childs to testify to such a swing effectively changes Schatzki's at-will employment relationship to something very different, as Schatzki would reap the benefit of her Capital Management salary going forward even though cases such as <u>Murphy v. American Home Prods.</u>, 58 N.Y.2d 293, 300-02, 448 N.E.2d 86, 89-90, 461 N.Y.S.2d 232, 235-36 (1983), permit her discharge without adverse financial consequences to her employer.

In the same way, Childs included in "before" revenues the sums that Capital Management had reimbursed Schatzki for her out-of-pocket business expenses; but because the methodology that Childs employed looked at receipts but not expenses, the

32

equivalent amounts in expenses that Schatzki paid were not subtracted out. See Aug. 14, 2012 Childs Dep., at 67:16-19, 72:9-16, 76:3 to 77:11, 98:25 to 100:16 (Dkt. No. 146-3, at pp. 9-11, 15); Jan. 21, 2014 Trial Tr., at 433:2 to 434:10, 452:17 to 456:16.   The effect was artificially to convert a net wash into lost income. Again, the result was to inflate Schatzki's damages.

Judge Sweet was wrong when he viewed these deficiencies as going to weight alone and not to admissibility.   The parties' difference was not, for example, what discount rate should be employed to reduce an income stream to present value, but rather the differences included whether an expert testifying to damages has to include expenses saved as well as income lost, whether the expert has to account for other factors that led to the loss of revenues, and whether revenues can consist of expense reimbursements. Those differences go to methodology and reliability. They are not the subject of debate among qualified experts, but, as seen, are questions of law and of the

propriety <u>vel non</u> of an expert's damages approach.  <u>See</u>
<u>Fed. R. Evid.</u> 702 (expert testimony inadmissible if
testimony not based upon sufficient facts or data,
testimony is not the product of reliable principles and
methods, or witness has not applied the principles and
methods reliably to the facts of the case); <u>see also</u>
<u>24/7 Records, Inc.</u>, 566 F. Supp. 2d at 316 (expert
testimony on lost profits inadmissible where operating
costs not taken into account); <u>Microstrategy Inc. v.</u>
<u>Bus. Objects, S.A.</u>, 429 F.3d 1344, 1355-36 (Fed. Cir.
2005) (expert report properly excluded due to failure
to "link a single loss to a specific misconduct" and
ignorance of "significant factors that might have
excluded the torts as the reason for the losses").

Judge Sweet was also wrong in not disposing of
Schatzki's case on motion.  <u>See</u> Jan. 23, 2014 Trial
Tr., at 709:16-19.  Even if it be assumed that she had
put in sufficient evidence of damages to go to the
jury, there was a vacuum on causation.  That vacuum

34

required judgment for defendants on this claim as a matter of law.

## POINT III

### DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE TRADEMARK INFRINGEMENT COUNT.

Defendants are also entitled to judgment as a matter of law on the trademark infringement count for two reasons. Both of these are reviewed de novo, as the issue involves both a matter of statutory interpretation and the sufficiency of the evidence to survive a motion for judgment. See, e.g., Highland Capital Management, LP v. Schneider, 607 F.3d 322, 326 (2d Cir. 2010); Hooks v. Forman, Holt, Eliades & Ravin, LLC, 717 F.3d 282, 284 (2d Cir. 2013).

The record is devoid of any evidence of actual or even potential confusion. Not a single customer or potential customer testified that he or she was confused, and there was no survey or similar evidence supporting a finding of such confusion. Indeed, there was no evidence that anyone even accessed the Capital Management website, let alone observed the mark there, during the two to four weeks that are relevant.

Confusion is an element of the cause of action even when an infringed mark is registered. <u>See</u>, <u>e.g.</u>, <u>Gruner + Jahr USA Publishing v. Pfizer, Inc.</u>, 991 F.2d 1072, 1076-77 (2d Cir. 1993); <u>Arrow Fastener Co. v. Stanley Works</u>, 59 F.3d 384, 390-91 (2d Cir. 1995). Because the Lanham Act's purpose is to prevent mistaken purchasing decisions resulting from infringing uses of trademarks, <u>e.g.</u>, <u>Lang v. Retirement Living Publishing Co.</u>, 949 F.2d 576, 583 (2d Cir. 1991), a plaintiff must prove that "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question." <u>Gruner + Jahr USA Publishing</u>, 991 F.2d at 1077; <u>accord</u>, <u>Arrow Fastener</u>, 59 F.3d at 390-91. <u>See also</u> <u>Streetwise Maps, Inc. v. VanDam, Inc.</u>, 159 F.3d 739, 743 (2d Cir. 1998) ("probability, and not a mere possibility, of confusion on the part of a large number of consumers").

The only way that Schatzki avoided an adverse judgment in the face of such an evidentiary failure was to seek statutory damages, (<u>see</u> June 7, 2013 Pls.' Pre-

37

Trial Br., at p.24 (Dkt. No. 141)), the prerequisite to which is a finding that the mark that Capital Management used was "counterfeit" within the meaning of 15 U.S.C. §§ 1116(d), 1117(c), because confusion is often presumed in counterfeiting cases.  See, e.g., Gucci Am., Inc. v. Duty Free Apparel, Ltd., 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003).

Schatzki's approach should not have succeeded for two related reasons.

First, as a matter of law the fact that the "Building, Protecting and Preserving Wealth for Generations" mark remained on the Capital Management website for a few weeks after Schatzki's termination did not transform it from genuine to a "counterfeit." Section 1116(d) exempts from the category "counterfeit mark" situations in which "the manufacture[r] or producer was, at the time of the manufacture or production in question, authorized to use the mark."

Courts have struggled -- and split -- over the meaning of that exemption even in straightforward

38

situations.[5]   This situation is more difficult still, because the date of "manufacture or production" is not obvious in the context of intangible uses of a mark, such as on a website.

The natural meaning of the words in the provision fits our situation:  Capital Management put the slogan on its website at a time when it was authorized to use that slogan, indeed because Schatzki insisted on it.  Jan. 22, 2014 Trial Tr., at 546:1-3. The fact that it subsisted on the website thereafter did not make the slogan "counterfeit," even if there were a technical infringement as the result of its

---

[5]   Defendants have uncovered no controlling Second Circuit precedent.  Compare U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185 (6th Cir. 1997), and Motor City Bagels, L.L.C. v. American Bagel Co., 50 F. Supp. 2d 460 (D. Md. 1999), and Pennzoil-Quaker State Co. v. Smith, 2008 U.S. Dist. LEXIS 124298 (W.D. Pa. Mar. 7, 2008) (cases supporting defendants' position), with State of Idaho Potato Comm'n v. G&T Terminal Packaging, Inc., 425 F.3d 708 (9th Cir. 2005) (decision turned on likelihood of confusion and involved a certification mark), and Century 21 Real Estate, LLC v. Destiny Real Estate Properties, 2011 U.S. Dist. LEXIS 147075 (N.D. Ind. Dec. 19, 2011) (also emphasizing risk of confusion) (cases supporting Schatzki's position).

use's having become unauthorized upon Schatzki's single request that it be removed.

All Star Championship Racing, Inc. v. O'Reilly Automotive Stores, Inc., 940 F. Supp. 2d 850, 871 (C.D. Ill. 2013) addresses an analogous situation. News articles and photographs displaying the mark appeared on the website after the uncontested termination date. Id. While granting summary judgment on liability for trademark infringement, the court held that the use of the marks was not counterfeit: Because the use was authorized at the time of "manufacture," the counterclaiming defendant

> will not be permitted as a matter of law to apply the counterfeit mark enhancement provision to any alleged trademark infringement occurring before the date ultimately adjudged to be the termination date of the sponsorship, even if Plaintiff made them available to the public after that date.

Id.

Second, this reading makes sense in part because the presumption of consumer confusion should

40

not apply in this situation. The presumption makes
complete sense in a situation in which the counterfeit
product is a "knockoff," such as the ever available
Gucci or Louis Vuitton luggage sold on the streets.
Although less clear, the same might be said of using a
franchisor's name and logo after the license to do so
has terminated, as when the realtor Century 21
terminates one of its franchisees. In those
situations, as the Gucci America case cited above
noted, "[C]onfusing the customer is the whole purpose
of creating counterfeit goods [or services]." Gucci
Am., 286 F. Supp. 2d at 287. See also U.S. Structures,
Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1190 (6th
Cir. 1997):

> A patron of a restaurant adorned with
> the Burger King trademark undoubtedly
> would believe that BKC endorses the
> operation of the restaurant.
> Consumers automatically would
> associate the trademark user with the
> registrant and assume that they are
> affiliated. . . . Because of this
> risk, many courts have held that
> continued trademark use by one whose
> trademark license has been canceled

41

> satisfies the likelihood of confusion test.

That construct cannot facilely be applied here. For one thing, the only evidence in the record reflects that Capital Management promptly and tactfully informed Schatzki's clients that she had left – there was no risk they would be misled otherwise by the brief retention of the mark on the website. For another, the only thing that appeared on Capital Management's website was the descriptive slogan "Building, Protecting and Preserving Wealth for Generations." Schatzki admitted that the mark was descriptive of what she did, (see Jan. 16, 2014 Trial Tr., at 208:3-10), and she made no showing –- and it is not intuitively obvious -- that those who consumed such services associated the slogan in their own minds with Schatzki. Unlike the handbag/luggage situation, there is no way in which to bridge the logical chasm between the fact of the unauthorized use and the required inference of consumer confusion.

So holding would not have deprived Schatzki of a remedy for the unauthorized use of her mark. She could have opted to prove actual damages for trademark infringement, or she could have contracted at the time of her employment for damages from the use of her mark after her departure from Capital Management. She chose to do neither.

## CONCLUSION

The judgment below should be reversed and remanded, with instructions to enter judgment for defendants. In the alternative with respect to the conversion count, an instruction should issue to vacate the award of prejudgment interest.

Dated:  September 8, 2014

                              Respectfully submitted,


                              _____/s/_____
                              Scott I. Unger
                              STARK & STARK, A Professional
                                   Corporation
                              Attorneys for Defendants-
                                   Appellants
                              993 Lenox Drive
                              Lawrenceville, NJ  08648
                              (609) 219-7417

Of counsel:

Ira G. Greenberg
EDWARDS WILDMAN PALMER LLP
750 Lexington Avenue, 8th floor
New York, NY  10022
(212) 308-4411

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 6,531 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a monospaced typeface that does not contain more than 10 1/2 characters per inch, using Microsoft Word in Courier New 14-point font.

Dated:  September 8, 2014

Respectfully submitted,

_____/s/_____
Scott I. Unger
STARK & STARK, A Professional
    Corporation
Attorneys for Defendants-
    Appellants
993 Lenox Drive
Lawrenceville, NJ  08648
(609) 219-7417

45

Of counsel:

Ira G. Greenberg
EDWARDS WILDMAN PALMER LLP
750 Lexington Avenue, 8th floor
New York, NY  10022
(212) 308-4411

# ADDENDUM[6]

## 15 U.S.C. § 1116(d)(1)(B)

15 U.S.C. § 1116(d).  Civil actions arising out of use of counterfeit marks.

(1)(B)  As used in this subsection the term "counterfeit mark" means—

(i)    a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered; or

(ii)    a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this Act are made available by reason of section 220506 of title 36, United States Code;

but such term does not include any mark or designation used on or in connection with goods or services of which the manufacturer or producer was, at the time of the manufacture or production in question authorized to use to the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.

---

[6]  The relevant portions of the statute included in this Addendum have been reproduced in accordance with Rule 28(f) of the Federal Rules of Appellate Procedure.

<u>15 U.S.C. § 1117(c)</u>

15 U.S.C. § 1117(c).  Statutory damages for use of counterfeit marks.  In a case involving the use of a counterfeit mark (as defined in section 34(d) [15 U.S.C. § 1116(d)]) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of--

    (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or

    (2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

48